**FIFTH DIVISION**
**PHIPPS, P. J.,**
**DILLARD and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**July 8, 2016**

# In the Court of Appeals of Georgia

A16A0640. SUMMEROUR v. CITY OF MARIETTA.

DILLARD, Judge.

The City of Marietta filed a condemnation petition to acquire property owned by Ray Summerour. Following a hearing, the court-appointed special master condemned the property and awarded Summerour $225,000, and, upon review, the trial court affirmed the special master's award. On appeal, Summerour contends that the trial court erred in failing to dismiss the petition, arguing that the City neglected to provide a summary of the basis for its just-compensation offer in violation of OCGA § 22-1-9 (3), and that the City violated OCGA § 22-1-9 (7) by negotiating with him in bad faith. Additionally, Summerour contends that the trial court erred in failing, at the very least, to recommit the case to the special master to complete the

record. For the reasons set forth *infra*, we vacate the trial court's order and remand the case for further proceedings consistent with this opinion.

The record shows that in late 2009, the voters of the City of Marietta approved a referendum for a $25,000,000 parks bond, which included $3,750,000 for the expansion of the Elizabeth Porter Recreation Center. At the time of the referendum, Summerour owned property, which included a small grocery store, adjacent to the eastern border of the recreation center, and the City identified his property as one of nine properties that it needed to acquire for the expansion. Toward that end, on June 10, 2010, the City contacted Summerour, via letter, and informed him of its interest in purchasing his property, that it had hired an appraiser to determine the value of his property, and that it would make an offer to purchase the property based on that value.

Shortly thereafter, on June 23, 2010, the City again contacted Summerour, via letter, informing him that the appraiser had valued his property at $85,000, and offering to purchase the property at that price. Summerour did not respond, and on October 6, 2010, the City sent him another letter proposing the same offer. Yet again, Summerour did not respond.

2

For reasons not entirely clear from the record, the City did not correspond further with Summerour until May 23, 2013, when it once again sent him a letter expressing its interest in purchasing his property. This correspondence was followed by yet another letter sent on July 26, 2013, in which the City informed Summerour that his property had a current appraised value of $95,000 and that the small grocery store on the property had an appraised value of $46,700. Consequently, the City offered to purchase the property for $141,700.

In response to this latest offer, on August 13, 2013, Summerour sent the City a letter indicating that its offer was lower than he expected and requesting a summary of the appraisal. Summerour added that he would be hiring his own appraiser and that he had learned during his attendance of City Council meetings that the City was considering acquiring his property by way of eminent domain. The City initially did not formally respond to Summerour's correspondence, and thus, on December 4, 2013, Summerour sent the City another letter, in which he offered to sell his property for $375,000. The City responded, via letter, on December 10, 2013, and increased its offer to $152,000 but further indicated that unless Summerour provided his own certified appraisal, the current offer would likely be its highest. Two days later, the

3

City repeated the $152,000 offer, also via letter, and added a request that Summerour respond by December 18, 2013.

On December 17, 2013, Summerour hand delivered a letter to the City, in which he rejected the City's offer but requested that the parties meet in order to discuss the differences in their respective appraisals. Over the course of the next several months, Summerour hired legal counsel and an appraiser and requested that the City postpone any formal action with respect to the property until his appraiser determined its value. The City complied, and informal discussions, mostly via emails, between the parties continued. However, during these discussions, the City stressed that it did not believe that formal settlement meetings would be productive unless Summerour first provided the appraisal value of the property from his licensed appraiser.

Expressing his client's frustration with the state of the negotiations, on May 8, 2014, Summerour's counsel complained, via letter, that the City had never provided copies of its appraisals or a summary of same as required by OCGA § 22-1-9 (3). And in that same letter, Summerour's counsel requested such information while also noting that Summerour hiring his own appraiser was not a prerequisite for negotiations under the statute. Then, shortly after this correspondence, the City

4

delivered a summary of its appraiser's report to Summerour, and the parties met for additional negotiations. Following this meeting, on May16, 2014, the City sent a letter to Summerour, in which it provided a full appraisal report dated July 17, 2013, and offered to purchase his property for $139,400. Over the course of the next few months, the parties continued negotiations but failed to reach an agreement. Consequently, on June 13, 2014, the City informed Summerour, via letter, that it was moving forward to acquire his property through condemnation.

On October 2, 2014, the City filed a condemnation petition to acquire Summerour's property in the Superior Court of Cobb County. Thereafter, Summerour filed an answer, and the trial court appointed a special master to conduct an evidentiary hearing on the matter. During that three-day hearing, both parties presented evidence regarding their respective valuations of the subject property, and Summerour also argued that the petition should be dismissed in light of the City's alleged failure to comply with OCGA § 22-1-9. On January 20, 2015, less than one week after the conclusion of the hearing, the special master issued a return finding that the City had complied with its statutory obligations and setting the fair market value of Summerour's property at $225,000.

Both parties filed appeals and special exceptions to the special master's return with the trial court. Subsequently, the trial court held its own hearing on the matter and ultimately entered an order adopting the special master's return in its entirety and denying both parties' special exceptions. Summerour then obtained a certificate of immediate review from the trial court and filed an application for interlocutory appeal with this Court, which we granted. This appeal follows.

Our analysis necessarily begins with the Takings Clause of the Fifth Amendment to the United States Constitution, which provides that private property shall not "be taken for public use, without just compensation."[1] Suffice it to say,

---

[1] U.S. CONST. amend. V; *see also* GA. CONST. Art. 1, Sec. 3, Para. I (a) ("Except as otherwise provided in this Paragraph, private property shall not be taken or damaged for public purposes without just and adequate compensation being first paid."); OCGA 22-1-5 ("Except in cases of extreme necessity and great urgency, the right of eminent domain cannot be exercised without first providing for just compensation to the owner for the interference with this exclusive rights."); OCGA § 22-1-6 ("If a person who is authorized to exercise the power of eminent domain cannot by contract procure the property . . . or other interest sought to be condemned, the person may take or damage the property or interest upon paying or tendering to the owner thereof just and adequate compensation."); *Horne v. Dep't of Agric.*, ___ U.S. ___, ___ (II) (A) (1) (135 SCt 2419, 192 LE2d 388) (2015) ("The principle reflected in the [Takings] Clause goes back at least 800 years to the Magna Carta . . . ."); Letter from William Pierce to St. George Tucker (Sept. 28, 1787), GAZETTE OF THE STATE OF GA., Mar. 20, 1788, *excerpted in* THURSTON GREENE, THE LANGUAGE OF THE CONSTITUTION 614 (1991) ("I conceive civil liberty is sufficiently guarded when personal security, personal liberty, and *private property*, are made the peculiar care of government.").

6

private property rights are among "the most basic of human rights,"[2] and it is the "charge of the courts to defend them vigilantly."[3] A classic taking is, of course, one in which "the government directly appropriates private property for its own use."[4] In this respect, the Supreme Court of the United States has explained that the Takings Clause is designed "not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking."[5] Thus, governmental action that works a taking of property

---

[2] William K. Lane III, *"Your Raisins or Your Life": The Harrowing of the Takings Clause in Horne v. U.S. Department of Agriculture*, 750 F3d 1128 (9th Cir. 2014), 38 HARV. J. LAW & PUB.POL'Y 761, 761 (2015) (quoting MILTON FRIEDMAN & ROSE D. FRIEDMAN, TWO LUCKY PEOPLE: MEMOIRS 605 (1998))

[3] Lane, *supra* note 5, at 761; *see also* JOHN LOCKE, *The Second Treatise*, TWO TREATISES OF GOVERNMENT § 124 (Peter Laslett ed., Cambridge Univ. Press 1960) (1698) ("The great and chief end, therefore, of Mens uniting into Commonwealths, and putting themselves under Government, is the Preservation of their Property."); OCGA § 22-1-3 ("It is the province of the General Assembly to determine when the right of eminent domain may be exercised. If, however, under pretext of such necessity the General Assembly should pass a law authorizing the taking of property for private use rather than for public use, the courts should declare the law inoperative.").

[4] *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 (IV) (122 SCt 1465, 152 LE2d 517) (2002) (quoting *E. Enters. v. Apfel*, 524 U.S. 498, 522 (IV) (A) (118 SCt 2131, 141 LE2d 451) (1998)).

[5] *First English Evangelical Lutheran Church of Glendale v. Cty. of Los Angeles*, 482 U.S. 304, 315 (II) (107 SCt 2378, 96 LE2d 250) (1987); *see also*

"necessarily implicates the 'constitutional obligation to pay just compensation.'"[6] And in reviewing a judgment from a condemnation proceeding, Georgia's appellate courts have "applied an 'any evidence' standard of review to affirm the factual findings of the trial court."[7] But the standard of review for "a question of law on appeal is de novo."[8] Thus, when such a question is at issue, "we owe no deference to the trial court's ruling and apply the 'plain legal error' standard of review."[9] With

_____

*Armstrong v. United States*, 364 U.S. 40, 49 (III) (80 SCt 1563, 4 LE2d 1554) (1960) ("The Fifth Amendment's guarantee that private property shall not be taken without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."); *Mayor & City Council of Baltimore City v. Valsamaki*, 916 A2d 324, 335 (II) (Md. 2007) ("The right to private property, and the protection of that right, is a bedrock principle of our constitutional republic.").

[6] *First English Evangelical Lutheran Church of Glendale*, 482 U.S. at 315 (II); *see also Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (43 SCt 158, 67 LEd 322) (1922) ("The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.").

[7] *Concept Capital Corp. v. DeKalb Cty.*, 255 Ga. 452, 452 (1) (339 SE2d 583) (1986); *accord City of Atlanta v. Heirs of Champion*, 244 Ga. 620, 622 (261 SE2d 343) (1979).

[8] *Ga. Transmission Corp. v. Worley*, 312 Ga. App. 855, 856 (720 SE2d 305) (2011) (punctuation omitted).

[9] *Id.* (punctuation omitted).

these guiding principles in mind, we turn now to Summerour's specific claims of error.

1. Summerour contends that the trial court erred in declining to dismiss the City's petition on the ground that the City failed to provide a summary of the basis for its just-compensation offer in violation of OCGA § 22-1-9 (3). We agree that, initially, the City failed to comply with the statute, and given this initial failure, we vacate the trial court's ruling and remand the case for further proceedings consistent with this opinion.

Tasked with interpreting statutory language, we necessarily begin our analysis with "familiar and binding canons of construction."[10] Indeed, in considering the meaning of a statute, our charge as an appellate court is to "presume that the General Assembly meant what it said and said what it meant."[11] And toward that end, we must afford the statutory text its plain and ordinary meaning,[12] consider the text

---

[10] *Holcomb v. Long*, 329 Ga. App. 515, 517 (1) (765 SE2d 687) (2014); *accord In re L. T.*, 325 Ga. App. 590, 591 (754 SE2d 380) (2014).

[11] *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (punctuation omitted); *accord Holcomb*, 329 Ga. App. at 517 (1); *Martinez v. State*, 325 Ga. App. 267, 273 (2) (750 SE2d 504) (2013).

[12] *See Holcomb*, 329 Ga. App. at 517 (1); *accord Deal*, 294 Ga. at 172 (1) (a); *see also Tibbles v. Teachers Retirement Sys. of Ga.*, 297 Ga. 557, 558 (775 SE2d 527)

9

contextually,[13] read the text "in its most natural and reasonable way, as an ordinary speaker of the English language would,"[14] and seek to "avoid a construction that makes some language mere surplusage."[15] In summary, when the language of a statute

---

(2015) ("A statute draws it meaning, of course, from its text.") (punctuation and citation omitted); *Chan v. Ellis,* 296 Ga. 838, 839 (1) (770 SE2d 851) (2015) (same); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies) . . . ."); *Singletary v. State*, 310 Ga. App. 570, 572 (713 SE2d 698) (2011) ("In construing these statutes, we apply the fundamental rules of statutory construction that require us to construe the statutes according to their terms, [and] to give words their plain and ordinary meaning . . . ." (punctuation omitted)).

[13] *See Arizona v. Inter Tribal Council of Arizona, Inc.*, ___U.S. ___ (II) (B) (133 SCt 2247, 186 LE2d 239) (2013) (Scalia, J.) ("Words that can have more than one meaning are given content, however, by their surroundings." (punctuation and citation omitted)); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]"); *accord Hendry v. Hendry*, 292 Ga. 1, 3 (1) (734 SE2d 46) (2012); *Holcomb*, 329 Ga. App. at 517 (1); *see also Tibbles*, 297 Ga. at 558 ("The common and customary usages of the words are important, but so is their context.") (punctuation and citation omitted); *Chan,* 296 Ga. at 839 (1) (same).

[14] *Deal*, 294 Ga. at 172-73 (1) (a); *accord Holcomb v. Long*, 329 Ga. App. 515, 518 (1) (765 SE2d 687) (2014).

[15] *In the Interest of L.T.*, 325 Ga. App. 590, 592 (754 SE2d 380) (2014) (punctuation omitted); *accord Deal*, 294 Ga. at 172-73 (1) (a); *Holcomb*, 329 Ga. App. at 518.

is "plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly."[16]

Here, OCGA § 22-1-9, entitled "Policies and practices governing condemnations," provides that

> [i]n order to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts, to assure consistent treatment for property owners, and to promote public confidence in land acquisition practices, all condemnations and potential condemnations shall, to the greatest extent practicable, be guided by the following policies and practices . . . .[17]

And in providing the details for one such policy and practice, OCGA § 22-1-9 (3) directs that

> [b]efore the initiation of negotiations for fee simple interest for real property, the condemning authority shall establish an amount which it

---

[16] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *accord Luangkhot v. State*, 292 Ga. 423, 424 (1) (736 SE2d 397) (2013); *see also Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." (punctuation omitted)).

[17] *See Holcomb*, 329 Ga. App. at 518 n. 15 (1) (explaining that "[a]s part of an act passed by the General Assembly and approved by the governor, the [codified] premable of a statute may properly be considered by our courts to the extent that it sheds light on the meaning of substantive terms contained in the statute.").

11

believes to be just compensation and shall make a prompt offer to acquire the property for the full amount so established. In no event shall such amount be less than the condemning authority's independent appraisal of the fair market value of such property. The condemning authority shall provide the owner of real property to be acquired with a written statement of, and summary of the basis for, the amount it established as just compensation. Where appropriate, the just compensation for the real property acquired and for damages to remaining real property shall be separately stated. The condemning authority shall consider alternative sites suggested by the owner of the property as of the compensation offered . . . .[18]

Summerour argues that "before the initiation of negotiations" the City failed to provide him with a summary of the basis for the amount it established as just compensation for his property. Turning to the plain text of the statute, "summary" is not defined; but the term is most commonly understood as "of a statement or account . . . containing or comprising the chief points or the sum and substance of a matter"[19] and "characterized by or involving conciseness or brevity."[20] Here, as previously noted, in June of 2010, after earlier informing Summerour of its interest in purchasing

---

[18] OCGA § 22-1-9 (3).

[19] THE COMPACT OXFORD ENGLISH DICTIONARY 1959 (2d ed. 1991).

[20] *Id.*

his property and that it had hired an appraiser to determine its value, the City wrote Summerour, informed him that its appraiser valued the property at $85,000, and offered to purchase the property for that amount. When Summerour did not respond, the City sent him an identical letter in October 2010. Then, almost three years later (in 2013), the City informed Summerour, via another letter, that his property had a current appraised value of $95,000 and that the small store on the property had a current appraised value of $46,700, and thus, the City would purchase the property for $141,700. And finally, in 2014, in response to Summerour's specific request, the City finally provided him with a summary of its appraiser's report, which it then followed with a letter providing a full appraisal report dated July 17, 2013, and an offer to purchase his property for $139,400.

The City contends that each of these offers complied with OCGA § 22-1-9 (3), but contrary to the City's argument, the 2010 and 2013 offers do not contain a sufficient summary of the basis for the amount the City established as just compensation, and the sufficient summary that was provided in 2014 came far too late (*i.e.*, long after "the initiation of negotiations").

Specifically, the City's June 23, 2010 "written statement of, and summary of the basis for, the amount it established as just compensation" for Summerour's

13

property was as follows: "The City of Marietta has employed a Certified Appraiser to appraise your property. The Certified Appraiser has valued your property at $85,000. The purpose of this letter is to offer you the appraised value of your property. Please review this offer and let me know if you are willing to sell your property to the City of Marietta for the certified appraised value." The City's October 6, 2010 offer was identical.

Before addressing the "substance" of the City's three offers from 2013, it is worth noting that these offers are arguably of no consequence for purposes of our analysis because OCGA § 22-1-9 (3) explicitly requires a "condemning authority" to "establish an amount which it believes to be just compensation and [to] make a prompt offer to acquire the property for the full amount so established" *prior to* "the initiation of negotiations" with the property owner. And by the City's own admission, it engaged in *"*constant and continuous negotiations" to acquire Summerour's property since "early summer 2010."

Nevertheless, even if we were to consider the City's offers to Summerour on July 26, 2013, December 10, 2013, and December 12, 2013, they do no more than note (1) that "[t]he city has engaged a professional certified real estate appraiser to conduct a current appraisal on your property," (2) the "current appraised value" of the

14

property (3) the value on "the business located on the property," (4) "the total value of the property," (5) the City's desire to purchase the property for the total value of the property identified in the offers, and (6) aspects of the parties's negotiations (including an increased offer to purchase the property).

Suffice it to say, *none* of the foregoing offers satisfy the dictates of OCGA § 22-1-9 (3). Indeed, the City, as the "condemning authority," was required to provide Summerour, as "the owner of real property to be acquired," with a "written statement of, and summary of the basis for, the amount it established as just compensation." And while the dictionary definition of "summary" does not demand great detail, we find that the summary envisioned by the statute requires, at a minimum, information sufficient—as part of the "prompt offer" required prior to the initiation of the negotiations—to provide the property owner with the ability to meaningfully evaluate the offer. This is evident not only from the text and structure of OCGA § 22-1-9 (3), but is also consistent with one of the explicitly stated purposes of OCGA § 22-1-9, which is "to encourage and expedite the acquisition of real property by agreements with owners." Simply informing the property owner that the property has been appraised and that the amount offered is the appraised amount, while certainly concise, fails to convey the sum *and* substance of the basis of the offer.

15

However, as even Summerour seems to concede, the City's 2014 offer, which contained a summary of the City's appraiser's report, did fully comply with OCGA § 22-1-9 (3). And although the City shortly thereafter provided Summerour with a full appraisal report, we do not find that the statute requires a condemning authority to provide this level of detail, which goes far beyond any reasonable definition of summary. Nevertheless, that Summerour ultimately received a full summary for the basis of the City's offer does nothing to alter the fact that it took the City several years to comply with OCGA § 22-1-9 (3). Moreover, the fact that such a summary was not provided until nearly *four years* into the parties' negotiations demonstrates that the City also ran afoul of the statute's directive that such negotiations occur expeditiously[21] and further bears on the issue of whether the City acted in bad faith, as we shall discuss *infra*. In sum, given the particular circumstances noted *supra*, we conclude that the trial court erred in finding that the City complied with the dictates of OCGA § 22-1-9.

2. Summerour also contends that the trial court erred in failing to dismiss the petition on the ground that the City negotiated in bad faith in violation of OCGA §

---

[21] *See* OCGA § 22-1-9 ("In order to encourage and expedite the acquisition of real property by agreements with owners . . . .").

16

22-1-9 (7). Given our holding in Division 1, *supra*, we must vacate the trial court's ruling and remand the case for further proceedings to resolve this issue.

OCGA § 22-1-9 (7) provides that "[i]n no event shall the condemnor act in bad faith in order to compel an agreement on the price to be paid for the property[.]" And in the context of condemnation cases, the Supreme Court of Georgia has held that the term "bad faith" has been "sharply distinguished from negligence or bad judgment and has been equated with conscious wrongdoing motivated by improper interest or by ill will."[22] Even more specifically, our Supreme Court has explained that the term "bad faith" has been "used side by side with the word 'fraud' in describing those exercises of official discretion to condemn lands with which the courts will interfere."[23]

Here, in its findings and return, the special master cursorily concludes that the City met its obligations under OCGA § 22-1-9 and participated in good-faith negotiations. But given our holding in Division 1, *supra*, that the City's 2010 and 2013 offers failed to comply with OCGA § 22-1-9 (3), the special master erred in

---

[22] *City of Atlanta v. First Nat. Bank of Atlanta*, 246 Ga. 424, 424-25 (271 SE2d 821) (1980); *accord Concept Capital Corp.*, 255 Ga. at 453 (3); *Brannen v. Bulloch Cty.*, 193 Ga. App. 151, 154 (387 SE2d 395) (1989).

[23] *City of Atlanta*, 246 Ga. at 425.

17

finding that the City complied with, at the very least, this subsection of the statute. And because it is unclear from a review of the return whether the special master predicated its finding that the City engaged in good faith upon its finding that the City had at all times complied with OCGA § 22-1-9 (3), or whether it treated those separate issues disjunctively, we must vacate the trial court's order adopting the return and remand the case for further proceedings, in which the issue of bad faith is more fully explored.

3. Finally, Summerour contends that the trial court erred in failing, at the very least, to recommit the case to the special master so that he can seek discovery from the City "and test whether the City's initial offer to purchase his property was for the full appraised value[.]" As previously noted, OCGA § 22-1-9 (3) requires that, prior to the "initiation of negotiations," the condemning authority "shall establish an amount which it believes to be just compensation and shall make a prompt offer to acquire the property for the full amount so established," which, "[i]n no event shall . . . be less than the condemning authority's independent appraisal of the fair market value of such property." Given our holding in Division 1, *supra*, we also must remand the case for further proceedings to allow the trial court to reconsider Summerour's request for any evidence related to the foregoing statutory directives.

18

For all of the foregoing reasons, we vacate the trial court's order adopting the special master's return, and we remand this case for further proceedings consistent with this opinion. In doing so, it is important to note that while Summerour has argued for the dismissal of the City's condemnation petition, we do not address in this opinion the issue of the proper remedy for the City's failure to comply with OCGA § 22-1-9. Indeed, given our remand of this case and directive to the trial court in that regard, any discussion of ultimate remedies would be premature.

*Judgment vacated and case remanded. Phipps, P. J., and Peterson, J., concur.*