302 Ga. 645
FINAL COPY

S17G0057. CITY OF MARIETTA v. SUMMEROUR.

BLACKWELL, Justice.

This case concerns a small grocery store on Allgood Road in Marietta and, more particularly, the parcel of land on which that store sits. Ray Summerour has owned the land for nearly three decades. The City of Marietta wants to acquire the land for the purpose of building a public park. When the City was unable to negotiate a voluntary sale of the parcel, it resolved to take the land by eminent domain, and it filed a petition in the Superior Court of Cobb County to condemn the property. Following an evidentiary hearing before a special master, see OCGA § 22-2-100 et seq., the superior court adopted the return of the special master and entered an order of condemnation.

Summerour appealed, and in Summerour v. City of Marietta, 338 Ga. App. 259 (788 SE2d 921) (2016), the Court of Appeals set aside the condemnation order. The Court of Appeals reasoned that, when the City

attempted to negotiate a voluntary sale of the land, it failed to fulfill its obligations under OCGA § 22-1-9, and the Court of Appeals directed that the case be remanded for the superior court to consider whether the failure to comply with Section 22-1-9 amounted to bad faith. We issued a writ of certiorari to review the decision of the Court of Appeals, and we now hold that compliance with Section 22-1-9 is an essential prerequisite to the filing of a petition to condemn, that the City failed in this case to fulfill that prerequisite, and that its petition to condemn, therefore, must be dismissed, irrespective of bad faith. We accordingly affirm the judgment of the Court of Appeals to the extent that it set aside the order of condemnation, but we reverse its direction to the superior court to inquire into bad faith.

1. The relevant facts are not in dispute. In 2009, Marietta voters approved the issuance of bonds for, among other purposes, the improvement and expansion of a park located at the site of an existing recreation center near the intersection of Allgood Road and North Marietta Parkway. Soon thereafter, the City commenced efforts to acquire several parcels of land in the vicinity of that recreation center, including the parcel owned by Summerour. On June 1, 2010, the City sent a letter to Summerour, informing him that the City had an interest

2

in his property, that it had hired an appraiser to determine the value of the land, and that an offer to purchase the property was forthcoming. Three weeks later, the City sent a written offer to Summerour, which said:

> The City of Marietta has employed a Certified Appraiser to appraise your property. The Certified Appraiser has valued your property at $85,000.00. The purpose of this letter is to offer you the appraised value of your property. Please review this offer and let me know if you are willing to sell your property to the City of Marietta for the certified appraised value.

Summerour did not respond to this offer. On October 6, 2010, the City sent another offer letter to Summerour, identical to its earlier written offer. Again, Summerour did not respond.

For the next two-and-a-half years, the City did not correspond further with Summerour. But then, on May 23, 2013, the City resumed its efforts to acquire his land. That day, the City sent a letter to Summerour in which it expressed its continuing interest in the land and suggested that, if Summerour had any interest in selling the property, he ought to contact the City. In that letter, however, the City did not offer to purchase the land for any particular amount. Summerour again did not respond. The City hired a real estate appraiser to reappraise the land, and it engaged a business appraiser to assess the value of the grocery store

3

that sits on the property. On July 26, 2013, a lawyer for the City sent another written offer to Summerour, which said:

> This firm represents the City of Marietta which has an interest in purchasing your property located at the above referenced address. The city has engaged a professional certified real estate appraiser to conduct a current appraisal on your property and the current appraised value is $95,000.00. In addition, the certified business appraiser has placed a value of $46,700.00 on the business located on the property. Therefore, the total value of the property is believed to be $141,700.00. Please accept this letter as an official request by the City of Marietta to purchase your property at the above address for the above stated value. At your convenience, please contact the undersigned regarding this matter.

On August 13, 2013, Summerour responded. In a letter to the City, he explained that he had cooperated with the appraisers hired by the City, meeting with them and giving them the information that they requested. Summerour asked for a summary of the appraisals done for the City or "some form of documentation to show me how [the appraisers] came up with the numbers," and he noted that the offer was less than he expected. Summerour said that he intended to obtain his own appraisal of the property, and he expressed his willingness to discuss the matter with the City.

On December 4, 2013, Summerour sent another letter to the City, in which he made a counteroffer to sell the property for $375,000. The next day,

4

Summerour met with a lawyer for the City to discuss his counteroffer. The City rejected the counteroffer on December 10, 2013. Two days later, the City offered $152,000 for the property and warned that, unless Summerour obtained his own appraisal and shared it with the City, "this is likely to be the [C]ity's highest offer." On December 17, 2013, Summerour rejected the latest offer but proposed a meeting to discuss the differences in how he and the City valued the property. Following the December negotiations, Summerour hired an attorney, and at some point, he obtained his own appraisal of the land.

In April 2014, the lawyers for the City and Summerour corresponded about the property on several occasions, although the City refused to schedule a meeting with Summerour until he had his own "written signed appraisal" in hand. On May 8, 2014, Summerour's lawyer sent a letter to the City, reminding the City that it never had provided Summerour with a summary of its appraisals, notwithstanding its repeated demands that Summerour produce his own appraisal report. At that point, the City finally provided a summary of its appraisals to Summerour, and on May 16, 2014, the City produced a copy of an appraisal report. That report was dated July 17, 2013, almost ten months prior to its production.

On May 21, 2014, the City notified Summerour that the mayor and city council soon would meet to consider whether to acquire the property by eminent domain. The City again offered to purchase the property based on its 2013 appraisal. A flurry of negotiations followed, in the course of which the City eventually offered $160,000 for the land, but Summerour rejected the City's final offer. On June 11, 2014, the city council approved a motion for the City to acquire the land by eminent domain.

On October 2, 2014, the City filed a petition in the Superior Court of Cobb County to condemn the parcel of land owned by Summerour. Summerour filed an answer, and the trial court appointed a special master to conduct an evidentiary hearing. For three days, the special master heard evidence from both parties regarding their respective valuations of the land. In addition, Summerour argued to the special master that the petition should be dismissed because the City had failed to comply with OCGA § 22-1-9 when it attempted to negotiate a voluntary sale of the land. On January 20, 2015, less than one week after the conclusion of the hearing, the special master issued written findings that the City had complied with its statutory obligations and had negotiated with Summerour in good faith. The special master also found that the fair market value of

Summerour's land was $225,000. The findings of the special master were returned to the superior court, and the parties filed exceptions to the return. After a hearing, the trial court adopted the special master's return as its own judgment, and it ordered the condemnation of the land.

Summerour appealed, and the Court of Appeals set aside the condemnation order. In its opinion, the Court of Appeals pointed to OCGA § 22-1-9 (3), which, it said, required the City to provide Summerour with a written summary of the basis for its valuation of his land before, or at least around the time that, negotiations commenced. See Summerour, 338 Ga. App. at 265 (1). Upon its review of the record, the Court of Appeals concluded that the City did not provide Summerour with any such summary in a timely manner, and indeed, the City only provided a summary in May 2014, "long after the initiation of negotiations." Id. (punctuation omitted). Noting that the failure of the City to fulfill its obligations under Section 22-1-9 (3) might be indicative of bad faith, the Court of Appeals directed the superior court on remand to reconsider the question of bad faith. See id. at 267 (2). The Court of Appeals declined to decide whether noncompliance with Section 22-1-9 (3) is remediable, irrespective of bad faith. See id. at 268 (3).

The City timely filed a petition for a writ of certiorari. We granted that petition, directing the parties to address three questions:

(1) To what extent are the provisions of OCGA § 22-1-9 mandatory requirements?

(2) Did the Court of Appeals err in determining that [the City] failed to comply with OCGA § 22-1-9 (3)?

(3) If the provisions of OCGA § 22-1-9 are mandatory and the Court of Appeals correctly determined that [the City] failed to comply, what is the proper remedy?

We turn now to these questions.

2. To begin, we consider the extent to which the provisions of OCGA § 22-1-9 are mandatory. The City contends that Section 22-1-9 sets forth merely suggested guidelines for condemnations, which are not mandatory or, at the least, judicially enforceable. Summerour responds that the provisions of Section 22-1-9 are mandatory except to the extent that compliance with those provisions is impracticable, and he says that the statute imposes meaningful and judicially enforceable limits upon condemnations, even if it leaves some matters to the discretion of the condemning authority. Each side finds some support for its position in the statutory text and context, but in the end, we conclude that Summerour has the better argument.

"A statute draws its meaning from its text." <u>Grange Mut. Cas. Co. v.</u>

8

Woodard, 300 Ga. 848, 857 n.8 (797 SE2d 814) (2017) (citation and punctuation omitted). When we read the statutory text, "we must presume that the General Assembly meant what it said and said what it meant," Deal v. Coleman, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (citation and punctuation omitted), and so, "we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." FDIC v. Loudermilk, 295 Ga. 579, 588 (2) (761 SE2d 332) (2014) (citation and punctuation omitted). "The common and customary usages of the words are important, but so is their context." Tibbles v. Teachers Retirement Sys. of Ga., 297 Ga. 557, 558 (1) (775 SE2d 527) (2015) (citation and punctuation omitted). "For context, we may look to other provisions of the same statute, the structure and history of the whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question." Zaldivar v. Prickett, 297 Ga. 589, 591 (1) (774 SE2d 688) (2015) (citation omitted).

Adopted in response to perceived abuses of eminent domain, Section 22-1-9 is a part of the Landowner's Bill of Rights and Private Property Protection Act of 2006. See Ga. L. 2006, p. 40. See also Stephen D. Morrison, Jr.,

9

Protecting Private Property: An Analysis of Georgia's Response to Kelo v. City of New London, 2 J. Marshall L. J. 51, 70 (2009).[1] Section 22-1-9 sets forth a number of "policies and practices" by which "all condemnations and potential condemnations shall, to the greatest extent practicable, be guided." When a government seeks to acquire real property, Section 22-1-9 calls for the government to, among other things, pursue negotiations before resorting to the power of eminent domain, obtain an independent appraisal of the real property to establish its fair market value, offer no less than the value established by the independent appraisal, disclose the basis for that valuation to the owner of the real property, and negotiate in good faith. In full, Section 22-1-9 provides:

> In order to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts, to assure consistent treatment for property owners, and to promote public confidence in land acquisition practices, all condemnations and potential condemnations shall, to

---

[1] The Act appears to have been adopted largely in response to the decision of the United States Supreme Court in Kelo v. City of New London, 545 U. S. 469 (125 SCt 2655, 162 LE2d 439) (2005). See Morrison, supra, at 70. In Kelo, the Supreme Court held that economic development qualifies as a "public use" under the Takings Clause of the United States Constitution, and therefore, a city could use its power of eminent domain to acquire private property for redevelopment by private industry. See Kelo, 545 U. S. at 483-484 (IV). Kelo sparked widespread concern throughout the nation about the potential abuse of eminent domain and the limited protections afforded by the Takings Clause. Around the time of the Kelo decision, there also were other concerns about the misuse of eminent domain in Georgia. See Morrison, supra, at 63-67 (noting concerns about a condemnation by the City of Stockbridge, which culminated in City of Stockbridge v. Meeks, 283 Ga. App. 343 (641 SE2d 584) (2007)).

the greatest extent practicable, be guided by the following policies and practices:

(1) The condemning authority shall make every reasonable effort to acquire expeditiously real property by negotiation;

(2) Where the condemning authority seeks to obtain a fee simple interest in real property, real property shall be appraised before the initiation of negotiations, and the owner or his or her designated representatives shall be given an opportunity to accompany the appraiser during his or her inspection of the property, except that the condemning authority may, by law, rule, regulation, or ordinance, prescribe a procedure to waive the appraisal in cases involving the acquisition by sale or donation of property with a low fair market value;

(3) Before the initiation of negotiations for fee simple interest for real property, the condemning authority shall establish an amount which it believes to be just compensation and shall make a prompt offer to acquire the property for the full amount so established. In no event shall such amount be less than the condemning authority's independent appraisal of the fair market value of such property. The condemning authority shall provide the owner of real property to be acquired with a written statement of, and summary of the basis for, the amount it established as just compensation. Where appropriate, the just compensation for the real property acquired and for damages to remaining real property shall be separately stated. The condemning authority shall consider alternative sites suggested by the owner of the property as of the compensation offered;

(4) No owner shall be required to surrender possession of real property before the condemning authority pays the agreed purchase price or deposits with the court in accordance with this title, for the benefit of the owner, an amount not less than the condemning authority's appraisal of the fair market value of such property or the amount of the award of compensation in the condemnation proceeding for such property;

(5) The construction or development of a project for public

11

use shall be so scheduled that, to the greatest extent practicable, no person lawfully occupying real property shall be required to move from a dwelling or to move his or her business or farm operation without at least 90 days' written notice from the condemning authority of the date by which such move is required;

(6) If the condemning authority permits an owner or tenant to occupy the real property acquired on a rental basis for a short term or for a period subject to termination by the condemning authority on short notice, the amount of rent required shall not exceed the fair rental value of the property to a short-term occupier;

(7) In no event shall the condemnor act in bad faith in order to compel an agreement on the price to be paid for the property;

(8) If any legal interest in real property is to be acquired by exercise of the power of eminent domain, the condemning authority shall institute formal condemnation proceedings. No condemnor shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his or her real property; and

(9) A person whose real property is being acquired in accordance with this title may, after the person has been fully informed of his or her right to receive just compensation for such property, donate such property, any part thereof, any legal interest therein, or any compensation paid to a condemning authority, as such person shall determine.

When a government is unable to acquire property by a voluntary sale negotiated as provided in Section 22-1-9, and it must resort to formal condemnation proceedings, other provisions of the Act set forth additional protections for property owners. OCGA § 22-1-10, for instance, imposes certain

12

notice requirements with which a condemning authority must comply before initiating formal condemnation proceedings. OCGA § 22-1-11 expressly authorizes a superior court in condemnation proceedings to decide, before title vests in the condemning authority, whether the condemnation is legally authorized,[2] and it permits the superior court to stay condemnation proceedings pending that decision. OCGA § 22-1-12 allows a property owner to recoup attorney fees and other costs if a condemnation is abandoned or determined to be unauthorized. And OCGA § 22-1-13 entitles landowners displaced by condemnation to recover certain relocation expenses. The text, structure, and history of the statute as a whole indicate that this statutory scheme is to protect property owners from abuse of the power of eminent domain at all stages of the condemnation process. See Morrison, supra, at 70-71. See also Jody Arogeti et al., Legislative Review, Eminent Domain, 23 Ga. St. U. L. Rev. 157, 190 (2006) (noting that the Act was understood at the time of its adoption "to increase due process for property owners and in effect give them a 'bill of rights'"). Its

---

[2] Even before the adoption of Section 22-1-11, a superior court in condemnation proceedings was authorized to consider whether the condemnation was within the lawful authority of the condemning authority. See City of Atlanta v. First Nat. Bank of Atlanta, 246 Ga. 424, 424 & n.1 (271 SE2d 821) (1980); Scarlett v. Georgia Ports Auth., 223 Ga. 417, 418 (1) (156 SE2d 77) (1967). Section 22-1-11 reinforces that longstanding rule.

protections are meant to, among other things, "assure consistent treatment for property owners [and] promote public confidence in land acquisition practices[.]" OCGA § 22-1-9.[3]

In this case, the heart of the dispute about the meaning of Section 22-1-9 owes to its introductory provision, specifically these words: "[A]ll condemnations and potential condemnations shall, to the greatest extent practicable, be guided by the following policies and practices[.]" Because the statute provides that a condemning authority is to be "guided" only "to the greatest extent practicable" by the provisions of Section 22-1-9, the City says, those provisions are effectively nothing more than suggestions from which a condemning authority may depart whenever it concludes that another course would be better. This understanding of Section 22-1-9 is confirmed, the City contends, by a contrast with the language of Section 22-1-10, which provides in unequivocal terms that "a governmental condemnor shall . . . ." Finally, the City points to cases in which the federal courts have addressed a federal statute

---

[3] This statement of legislative purpose appears in the codified preamble of Section 22-1-9. As our Court of Appeals has explained, "codified preambles *are* part of the act and appropriate to read in pari materia." Harrison v. McAfee, 338 Ga. App. 393, 400 (2) (b) (788 SE2d 872) (2016) (Peterson, J.) (citations omitted; emphasis in original).

14

from which many provisions of Section 22-1-9 were borrowed, noting that the federal courts have concluded that the federal statute is not mandatory or judicially enforceable.

Summerour, on the other hand, notes that the provisions of Section 22-1-9 are introduced not in terms of a suggestion, but instead by words of command ("shall . . . be guided"). He points as well to OCGA § 22-1-8, a statute that predates the Act of 2006 but provides that "[a]ll persons authorized to take or damage private property for public purposes shall proceed as set forth in this title," a title that now includes, of course, the provisions of the Act. That Section 22-1-9 offers relief to condemning authorities in instances in which strict compliance is not practicable, Summerour says, makes its provisions no less mandatory in cases in which compliance is practicable. As for the federal case law cited by the City, Summerour argues that it not only fails to support the City's interpretation of Section 22-1-9, but confirms the interpretation that he urges.

As Summerour argues, the City makes too much, we think, of the introductory provision of Section 22-1-9. To the extent that the statute demands compliance, we acknowledge that it does so, generally speaking, only "to the

15

greatest extent practicable." That feature alone, however, is hardly proof that the provisions are entirely optional for a government condemnor. "Practicable" is a word susceptible of a limited range of meanings — as we will discuss in Division 3 — and to say that one must comply with a requirement "to the greatest extent practicable" is not to say that he must comply with it only "if he feels like complying" or "if he thinks it a good idea." Cf. Brown v. Bd. of Ed. of Topeka, 349 U. S. 294, 300 (75 SCt 753, 99 LE 1083) (1955) (desegregation decrees ought to require "admission to public schools as soon as practicable on a nondiscriminatory basis," and constitutional imperative to desegregate could not be overcome "simply because of disagreement with [it]"). That the statute leaves some flexibility to condemning authorities in cases in which strict compliance would be impracticable does not indicate that the provisions of Section 22-1-9 are not mandatory. Indeed, if the statute were entirely optional, there would be no need for a provision affording such flexibility.

As for the fact that the introductory provision of Section 22-1-9 uses the phrase "shall . . . be guided," we concede that this phrasing is less certain than

16

the simple "shall" that appears in the introduction of Section 22-1-10.[4] Even so, Section 22-1-9 still uses a word of command to introduce the provisions that follow. At most, the introductory provision is somewhat ambiguous about the extent to which the provisions that follow are mandatory. Important context, however, resolves any such ambiguity and establishes that the statute is most reasonably understood as mandatory.

We noted earlier that the text, structure, and history of the 2006 Act as a whole reveals a remedial purpose of protecting property owners against abuse of the power of eminent domain at every stage of the condemnation process and thereby promoting public confidence in the exercise of that power. Within this statutory scheme, Section 22-1-9 serves the important function of addressing abusive practices in negotiations prior to the commencement of formal condemnation proceedings, a stage at which no contemporaneous judicial oversight is available and property owners may be most vulnerable. If Section

---

[4] We note, however, that a simple "shall" suffices in Section 22-1-10 ("a governmental condemnor shall") because all of the provisions that follow are directed specifically to the condemning authority. The provisions of Section 22-1-9, on the other hand, are directed to "all condemnations and potential condemnations," not always the condemning authority in particular. See, e.g., OCGA § 22-1-9 (9) ("A person whose real property is being acquired in accordance with this title may, after the person has been fully informed of his or her right to receive just compensation for such property, donate such property, any part thereof, any legal interest therein, or any compensation paid to a condemning authority, as such person shall determine.").

17

22-1-9 were entirely optional, as the City urges, the protective function of the Act as a whole would be impaired significantly. It is a settled principle of our law of statutory interpretation that, when confronted with ambiguities in a remedial statute, and in the absence of contrary indicia of meaning, we commonly construe the statutory provisions broadly "to apply to all cases [consistent with the remedial purpose] which, under a fair construction of their terms, they can be made to reach." East Ga. Land & Dev. Co. v. Baker, 286 Ga. 551, 553 (2) (690 SE2d 145) (2010) (citation and punctuation omitted).

More significantly, the federal cases to which the City points are instructive, but they lead to a conclusion at odds with the interpretation that the City urges. In large part, the provisions of Section 22-1-9 were borrowed from 42 USC § 4651, a part of the Federal Relocation Assistance and Real Property Acquisition Policies Act of 1970. Indeed, the preamble and introductory provision of Section 22-1-9 is virtually identical to that of the federal statute, and many of the provisions that follow essentially mirror those found in the federal statute. And as the City notes, the federal courts consistently have understood 42 USC § 4651 as discretionary and affording no judicially enforceable rights to property owners. But there is a crucial difference. Another

18

provision of the federal law, 42 USC § 4602 (a), states unequivocally that "[t]he provisions of section 4651 of this title create no rights or liabilities and shall not affect the validity of any property acquisitions by purchase or condemnation." All of the federal cases cited by the City rely not on the preamble and introductory provision of 42 USC § 4651 to conclude that it is not mandatory, but rather, on the express disclaimer in 42 USC § 4602. See, e.g., United States v. 410.69 Acres of Land, 608 F2d 1073, 1074 n.1 (5th Cir. 1979) (citing 42 USC § 4602 for the proposition that "Congress . . . made it clear that [42 USC § 4651] creates no rights in landowners"); Portland Nat. Gas Transmission Sys. v. 4.83 Acres of Land, 26 FSupp.2d 332, 336 (II) (A) (D.N.H. 1998) (citing 42 USC § 4602 (a) for the proposition that 42 USC § 4651 "does not create any substantive rights" in condemnees); Tennessee Gas Pipeline Co. v. New England Power, C.T.L., Inc., 6 FSupp.2d 102, 104 (D. Mass. 1998) (citing 42 USC § 4602 (a)). See also United States v. 416.81 Acres of Land, 525 F2d 450, 454 (III) (7th Cir. 1975) (landowners' argument about government's failure to comply with 42 USC § 4651 "might have some force were it not for the language of [42 USC § 4602]"); State v. Costich, 98 P3d 795, 799 (Wash. 2004) ("While it is true the quoted provisions of [state version of 42 USC § 4651]

19

seemingly impose . . . mandatory obligations on the condemning authority, the legislature expressly rejected this approach." (citing state version of 42 USC § 4602)).

When our General Assembly borrowed from 42 USC § 4651 in its adoption of Section 22-1-9, it did not borrow the disclaimer from 42 USC § 4602. "We must presume that its failure to do so was a matter of considered choice." Fair v. State, 284 Ga. 165, 168 (2) (b) (664 SE2d 227) (2008) (citations and punctuation omitted). See also Summerlin v. Ga. Pines Community Svc. Bd., 286 Ga. 593, 594 (2) (690 SE2d 401) (2010) ("The General Assembly is presumed to enact all statutes with full knowledge of the existing condition of the law and with reference to it."). This important context, as much as anything else, suggests that Section 22-1-9 is understood most reasonably as mandatory, not optional. We hold that compliance with the provisions of Section 22-1-9 is required to the extent that compliance is "practicable."

3. We now consider whether the City complied with Section 22-1-9 (3), which provides:

> *Before the initiation of negotiations for fee simple interest for real property*, the condemning authority shall establish an amount which it believes to be just compensation and shall make a prompt

offer to acquire the property for the full amount so established. In no event shall such amount be less than the condemning authority's independent appraisal of the fair market value of such property. *The condemning authority shall provide the owner of real property to be acquired with a written statement of, and summary of the basis for, the amount it established as just compensation.* Where appropriate, the just compensation for the real property acquired and for damages to remaining real property shall be separately stated. The condemning authority shall consider alternative sites suggested by the owner of the property as of the compensation offered[.]

OCGA § 22-1-9 (3) (emphasis supplied). We agree with the Court of Appeals that the City violated this provision because it failed to disclose the appraisal summary to Summerour in a timely manner.[5]

The City's main argument is that the clause "[b]efore the initiation of negotiations for fee simple interest for real property" applies only to the first sentence of Section 22-1-9 (3), concerning a "prompt offer," and that the sentence requiring an appraisal summary — appearing in the middle of that subsection — does not contain an express timing requirement. Thus, the City contends, it was required to provide an appraisal summary (if at all) not *before*

---

[5] The City argues, among other things, that the Court of Appeals incorrectly applied a de novo standard of review and failed to give proper deference to the fact findings of the trial court and the special master. But the facts relevant to the Court of Appeals's decision were not in dispute, and thus a de novo review was proper. See Trax-Fax, Inc. v. Hobba, 277 Ga. App. 464, 464 (627 SE2d 90) (2006) ("[E]rroneous applications of law to undisputed facts . . . are subject to a de novo standard of review.").

21

beginning negotiations, but at whatever time it deemed necessary and practicable. The City's reading of the statute, however, is too narrow. "When we consider the meaning of a statutory provision, we do not read it in isolation, but rather, we read it in the context of the other statutory provisions of which it is a part." Hartley v. Agnes Scott College, 295 Ga. 458, 462 (2) (b) (759 SE2d 857) (2014); Hendry v. Hendry, 292 Ga. 1, 3 (1) (734 SE2d 46) (2012). See also Houston v. Lowes of Savannah, Inc., 235 Ga. 201, 203 (219 SE2d 115) (1975) ("[A] statute must be viewed so as to make all its parts harmonize and to give a sensible and intelligent effect to each part."). Viewed in context with the rest of Section 22-1-9, the provision at issue is best understood to ensure that the landowner receives enough accurate appraisal information to enable a fair negotiation of the property sale. As the Court of Appeals explained below, "the summary envisioned by the statute requires, at a minimum, information sufficient . . . to provide the property owner with the ability to meaningfully evaluate the offer." Summerour, 338 Ga. App. at 266 (1). Without appraisal information, a landowner cannot know whether an offer is fair and whether it reflects the true market value of the property. As to timing, the stated statutory goal of promoting fair and expeditious negotiations is best served if the

22

appraisal summary is provided as early in the negotiation process as possible. Section 22-1-9 (3) requires a condemning authority to obtain an appraisal "[b]efore the initiation of negotiations," and so, it is reasonable to conclude that the government must also provide the appraisal summary at that time, or at least as soon thereafter as practicable.

If we interpret the provision at issue to contain no timing requirement whatsoever, the city could wait even until *after* formally condemning the property before providing the summary — an absurd result that would defeat the purpose of this provision. See Roberts v. Deal, 290 Ga. 705, 709 (2) (723 SE2d 901) (2012) (statutes generally should be construed to "avoid absurd results"). Thus, we give this provision its most sensible and reasonable meaning: a condemning authority must provide the appraisal summary prior to the initiation of negotiations or as soon thereafter as "practicable."

In this case, the City sent Summerour three letters in 2010, one of which expressed interest in purchasing the property, and two of which communicated a specific offer — $85,000. Three years later, in July 2013, the City sent Summerour a slightly more detailed letter, breaking down the offer amount into $95,000 for the property and $46,700 for the store business. While each of these

letters contained an offer and purported to be based on an appraisal, none of them constituted a "summary of the basis for" the offer amount as contemplated by Section 22-1-9 (3). See Summerour, 338 Ga. App. at 266 (1). The City did not send Summerour an appraisal summary until May 2014. Even if we consider the July 2013 appraisal as the only relevant appraisal and the July 2013 letter as the true start of negotiations, the appraisal summary came nearly 10 months later. We agree with the Court of Appeals that "the 2010 and 2013 offers do not contain a sufficient summary of the basis for the amount the City established as just compensation, and the sufficient summary that was provided in 2014 came far too late."[6] Summerour, 338 Ga. App. at 265 (1).

We understand that the City may have had its reasons for withholding the appraisal summary. The City explains that it was, at the time, attempting to negotiate the sale not only of the land owned by Summerour, but several neighboring parcels. If the City had provided each of the several owners with

---

[6] Appraisals are opinions about valuation at a particular point in time, and they become stale over time. We cannot say with confidence that the July 2013 appraisal had not grown stale by the time a summary of the basis for that appraisal was disclosed in May 2014. Cf. Fannie Mae, Selling Guide (Single Family), Appraisal Age and Use Requirements, § B4-1.2-02 (2017) (available at: https://www.fanniemae.com/content/guide/sel092617.pdf, last visited on Oct. 23, 2017) ("When an appraisal report will be more than four months old on the date of the note and mortgage . . . the appraiser must inspect the exterior of the property and review current market data to determine whether the property has declined in value since the date of the original appraisal.").

24

information about the basis for their respective appraisals, the owners might have compared information, and those with parcels that had been appraised lower than neighboring parcels might misapprehend that their parcels had been undervalued. Such misapprehensions, the City worries, would have driven up the prices at which the owners would voluntarily agree to sell their land. This argument is unavailing. In the first place, the idea on which it is based strikes us as highly implausible. There was nothing to stop the owners of the neighboring parcels from comparing *offers*, and any such comparison would have revealed any substantial disparities in the valuations. The notion that any misgivings arising from these disparities would be dispelled by withholding information about the basis for the appraisals — information that presumably, of course, would have explained the disparities — seems far-fetched.

More important, "practicable" does not mean convenient. In modern usage, "practicable" is commonly understood to mean "reasonably capable of being accomplished" or "feasible in a particular situation." Black's Law Dictionary (10th ed. 2014). See also 2 New Shorter Oxford English Dictionary, p. 2317 (1993 ed.) ("practicable" means "[a]ble to be put into practice; able to be effected, accomplished, or done; feasible"). To say that something is

25

impracticable is to say that it reasonably cannot be done; it does not mean merely that it is inconvenient. The reasons offered by the City for withholding information about the appraisal for as long as it did go to the convenience of the City, not the feasibility of disclosing that information to Summerour. It was entirely feasible for the City to provide the appraisal summary to Summerour long before it actually did so. Thus, the City failed to comply with the dictates of Section 22-1-9 (3).[7]

4. We now turn to the issue of what remedy is available to Summerour as a result of the City's violation of Section 22-1-9 (3). The City contends that, even if it violated subsection (3), no remedy is available to Summerour, except upon a showing of bad faith, because Section 22-1-9 itself does not contain a remedial provision, and "it is well settled that violating statutes and regulations does not automatically give rise to a civil cause of action by an individual

---

[7] The City also argues that interpreting subsection (3) to require disclosure of an appraisal summary before condemnation proceedings are commenced would be inconsistent with the Open Records Act, OCGA § 50-18-72 (a) (9), which, at the time Section 22-1-9 was enacted, exempted real estate appraisals from public disclosure until condemnation proceedings have been concluded, i.e., "until such time as the property has been acquired or the proposed transaction has been terminated or abandoned." Black v. Dept. of Transp., 262 Ga. 342, 342 (417 SE2d 655) (1992) (citation omitted). The City's argument, however, is unavailing. The Open Records Act governs the disclosure of government records to members of the general public who seek such records – it has nothing to do with the flow of information between parties to a transaction. Requiring a government buyer to disclose certain information to the seller does not conflict with the government's option to prevent disclosure of this information pursuant to an Open Records Act request from a third party.

26

claiming to have been injured from a violation thereof." <u>Govea v. City of Norcross</u>, 271 Ga. App. 36, 41 (1) (608 SE2d 677) (2004). But a "cause of action" is just one type of remedy. It may well be true that a violation of Section 22-1-9 will not, by itself, allow the aggrieved individual to sue the condemning authority. But we need not decide the issue here because that is not what Summerour is trying to do. Summerour is simply requesting a defensive remedy — the dismissal of the City's condemnation petition. And dismissing the condemnation petition is an appropriate remedy where a condemning authority has acted outside its authority by violating the law, irrespective of bad faith. See <u>City of Atlanta v. First Nat. Bank of Atlanta</u>, 246 Ga. 424, 425 (271 SE2d 821) (1980) (reversing the disallowance of condemnation because the landowner failed to show that the city either acted in bad faith or "exceeded its lawful authority"); <u>Miles v. Brown</u>, 223 Ga. 557, 559 (156 SE2d 898) (1967) (condemnation was authorized where landowner "produced no evidence to show that the action of the defendants was in bad faith or *beyond the powers conferred upon them by law*" (emphasis supplied)).

Georgia law has always required governments to comply strictly with condemnation procedures when exercising the power of eminent domain, and

the procedures listed in Section 22-1-9 are no exception. See OCGA § 22-1-8 ("All persons authorized to take or damage private property for public purposes shall proceed as set forth in this title."). As we explained over a century ago,

> [t]he taking or injuring of private property for the public benefit is the exercise of a high power, and all the conditions and limitations provided by law, under which it may be done, should be closely followed. Too much caution in this respect cannot be observed to prevent abuse and oppression.

Frank v. City of Atlanta, 72 Ga. 428, 432 (2) (1884); Sims v. City of Toccoa, 256 Ga. 368, 369 (349 SE2d 385) (1986) (same); Dept. of Transp. v. City of Atlanta, 255 Ga. 124, 132 (3) (b) (337 SE2d 327) (1985) ("[W]hile the procedure for condemnation under OCGA § 32-3-2 et seq. does not violate due process, the statute must be strictly conformed to by the condemning body." (citation and punctuation omitted)). See also Thomas v. City of Cairo, 206 Ga. 336, 338 (57 SE2d 192) (1950) ("The power of eminent domain should never be exercised unless and until there has been a strict compliance with the provisions of the law by the condemnor."); D'Antignac v. City Council of Augusta, 31 Ga. 700, 710 (1861) ("[I]n proceedings by statute authority, whereby a man may be deprived of his property, the statute must be strictly pursued. Compliance with all its prerequisites must be shown."). Indeed, we

28

previously have countenanced equitable remedies to halt condemnation proceedings in cases in which the condemnor failed to comply with statutory obligations to attempt negotiations before resorting to the exercise of eminent domain. See, e.g., City of Atlanta v. Austell, 146 Ga. 456, 456 (91 SE 478) (1917) ("In not giving petitioner notice in his representative capacity, and in not attempting to agree with him in a representative capacity as to the price to be paid for the land, the city had failed to comply with the provision of the statutory requisite to the condemnation of property for public purposes."); City of Elberton v. Hobbs, 121 Ga. 750 (49 SE 780) (1905) ("Failure to secure the property by contract, by reason of the inability of the parties to agree upon the compensation to be paid therefor, is an essential prerequisite to the condemnation of private property for public uses.").

Because the City failed to comply with Section 22-1-9 (3), and because there is no evidence in the record that Summerour acquiesced in or waived strict compliance with the statute, the City acted outside its authority by condemning Summerour's property, and the City's condemnation petition must be

29

dismissed.[8] See Thomas, 206 Ga. at 338 (trial court erred in refusing to enjoin condemnation proceedings where, by attempting to limit its liability for payment of compensation, city "has not sufficiently complied with the law in order to exercise the high power of eminent domain"); Suburban Investment Co. v. City of Atlanta, 148 Ga. 593, 594-596 (97 SE 542) (1918) (condemnation should have been enjoined where city failed to comply with condemnation procedure by passing an ordinance in an untimely manner). See also Stafford v. Bryan County Bd. of Ed., 267 Ga. 274, 275 (476 SE2d 727) (1996) (trial court erred by entering judgment on condemnation award where "the plain language of OCGA § 22-2-112 was not followed and the record is clear that there was no

---

[8] We do not decide today whether a minor, technical, and clearly harmless violation of Section 22-1-9 requires dismissal. The violation in this case was neither minor, technical, nor clearly harmless. The City's failure to timely provide an appraisal summary to Summerour substantially undermined fair negotiations. The July 2013 appraisal was nearly eleven months old by the time the City provided it to Summerour, and this appraisal may not have accurately reflected the current value of the property. Moreover, the City's long delay in providing a sufficient basis for its offer increased at least the appearance of bad faith, undermining trust and increasing the potential for litigation. Indeed, by the time the City provided the appraisal, mistrust and frustration on both sides were high enough that negotiations effectively ceased within a matter of days. This is exactly what Section 22-1-9 was designed to prevent.

We also note that a failure to comply with Section 22-1-9 — even when that failure requires the dismissal of a condemnation petition — does not permanently foreclose efforts to acquire a particular property. If a condemnor violates some provision of Section 22-1-9 — for example, by failing to provide an appraisal summary at or before the initiation of negotiations and failing to rectify that failure for a long period of time — it might effectively reset its opportunity to comply with the statute by obtaining a new appraisal and reinitiating negotiations, giving a summary of that appraisal to the landowner at the time negotiations recommence.

acquiescence in or waiver of strict compliance with the statute"); <u>Wrege v. Cobb County</u>, 186 Ga. App. 512, 514 (1) (367 SE2d 817) (1988) ("strict statutory requirements mandated by the Legislature" cannot be "ignored or deliberately sidestepped with impunity by the condemning authority," even if the landowners "arguably" benefitted from the violation).[9] There is no need for the trial court to reconsider the question of bad faith, and to the extent that the Court of Appeals directed the trial court to do so on remand, its judgment is reversed.

 <u>Judgment affirmed in part and reversed in part. Hines, C. J., Melton, P. J., Benham, Hunstein, Nahmias, Boggs, Grant, JJ., and Judge David L. Cannon, Jr., concur. Peterson, J., disqualified</u>.

---

[9] Section 22-1-12 provides additional remedies, including attorney fees, when "final judgment is that the condemning authority cannot acquire the real property by condemnation[.]" Having concluded that the City's condemnation petition must be dismissed, we leave it to the trial court to determine the appropriate costs and expenses to which Summerour may be entitled under Section 22-1-12.

31

Decided October 30, 2017 — Reconsideration denied November 14, 2017.

Certiorari to the Court of Appeals of Georgia — 338 Ga. App. 259.

Haynie, Litchfield, Crane & White, Douglas R. Haynie, Daniel W. White, Sarah G. Hegener, for appellant.

Donald C. Evans, Jr., for appelllee.

Richard N. Hubert, amicus curiae.