304 Ga. 574
FINAL COPY

S17G2021. RUTH et al. v. CHEROKEE FUNDING, LLC et al.

BLACKWELL, Justice.

In Cherokee Funding v. Ruth, 342 Ga. App. 404 (802 SE2d 865) (2017), our Court of Appeals decided that neither the Industrial Loan Act, OCGA § 7-3-1 et seq., nor the Payday Lending Act, OCGA § 16-17-1 et seq.,[1] applies to certain transactions in which a financing company provides funds to a plaintiff in a pending personal-injury lawsuit, the plaintiff is obligated to repay the funds with interest only if his lawsuit is successful, and his obligation to repay is limited to the extent of the damages that he recovers in the lawsuit. We granted a petition for a writ of certiorari to review the decision in Cherokee Funding, and like the Court of Appeals, we conclude that neither the Industrial Loan Act

---

[1] The name "Payday Lending Act" does not appear in our Code but is used "simply as a convenient nickname" and should not suggest that the Act applies merely "to what is commonly referred to as payday lending." Western Sky Financial v. State of Ga., 300 Ga. 340, 343 (1) (a) (793 SE2d 357) (2016).

nor the Payday Lending Act applies to the transactions at issue in this case. Accordingly, we affirm the judgment of the Court of Appeals.

1. According to the pleadings,[2] Ronald Ruth and Kimberly Oglesby sustained injuries in automobile accidents, and they retained attorney Michael G. Hostilo to represent them in connection with lawsuits to recover damages for their injuries. While their lawsuits were pending, Ruth and Oglesby obtained funds from Cherokee Funding[3] pursuant to financing agreements that Hostilo (or someone at his law firm) signed on their behalf.[4] By the terms of these

---

[2] This case came to the Court of Appeals as an interlocutory appeal from a ruling of the trial court on a motion to dismiss for failure to state a claim upon which relief might properly be granted pursuant to OCGA § 9-11-12 (b) (6). Accordingly, we view the pleadings in the light most favorable to the plaintiffs, and we must accept the truth of the facts alleged in their complaint. See Atlanta Dev. Auth. v. Clark Atlanta Univ., 298 Ga. 575, 578 (I) (784 SE2d 353) (2016).

[3] It appears that Ruth and Oglesby dealt with three affiliated companies, all using the "Cherokee Funding" name — Cherokee Funding, LLC, Cherokee Funding II, LLC, and Cherokee Funding III, LLC. Each of these companies is a defendant in this lawsuit and a party to this appeal, as is Reid M. Zeising, the founding member of the Cherokee Funding companies. Nevertheless, for the purposes of this opinion, we need not distinguish among the three Cherokee Funding companies and Zeising, and we will refer to them simply as "Cherokee Funding."

[4] According to the pleadings, Hostilo commonly directed his clients to Cherokee Funding if they needed "lawsuit loans or advances." When a client sought financing from Cherokee Funding, the law firm would consult with Cherokee Funding about the potential settlement value of the client's lawsuit. And when Cherokee Funding agreed to provide financing to a client, it typically would prepare and send a financing agreement to the law firm for execution on behalf of the client under a power of attorney.

financing agreements, Cherokee Funding would provide funds to Ruth and Oglesby for personal expenses, and for the most part, their obligation to repay those funds was contingent upon the success of their lawsuits.[5] If they recovered nothing in their lawsuits, they would have no obligation to repay the funds that Cherokee Funding had provided. If they recovered damages, however, they would be required to repay the amounts that Cherokee Funding had provided, as well as interest at a rate of 4.99 percent per month[6] and various other "fees,"[7]

---

Ruth and Oglesby both signed powers of attorney that gave Hostilo limited authority to act on their behalf. When Hostilo (or someone at his law firm) signed financing agreements for Ruth and Oglesby, he purported to act pursuant to these powers of attorney. We do not decide today whether the powers of attorney actually authorized Hostilo to enter into financing agreements with Cherokee Funding on behalf of Ruth and Oglesby, nor do we express any opinion about the extent to which Hostilo's dealings with Cherokee Funding on behalf of Ruth and Oglesby were consistent with his professional obligations as an attorney. Neither of those issues is presently before us, although we note that the pleadings in this case give cause to be concerned about the powers of attorney.

[5] The financing agreements provide that, if Ruth or Oglesby were to discontinue their relationships with Hostilo and retain new counsel prior to the conclusion of their lawsuits, they would be obligated to pay "liquidated damages" to Cherokee Funding unless any new lawyer appearing for them in the lawsuits ratified and agreed to be bound by the terms of their financing agreements. The financing agreements otherwise made repayment contingent upon the success of the lawsuits.

[6] The financing agreements refer not to "interest," but instead to a "use fee" of 4.99 percent per month. Notwithstanding the nomenclature of the financing agreements, the "use fee" is properly characterized as interest. See Black's Law Dictionary (10th ed.) at 935 ("interest" is "[t]he compensation fixed by agreement . . . for the use or detention of money").

[7] These other "fees" include a "Mailing Fee," a "Processing Fee," and an "Application Fee."

3

up to the amount of their recovery. In no event would they be required to pay Cherokee Funding any amounts in excess of their lawsuit recovery. In fact, Ruth and Oglesby would not have been in default under the financing agreements if they dismissed their underlying lawsuits and kept the money they received from Cherokee Funding.

Hostilo (or someone at his firm) signed the initial financing agreement for Ruth in April 2012, after Ruth asked Hostilo about a loan to cover his personal expenses while his lawsuit was pending. Cherokee Funding then provided $5,550 to Ruth in several small installments between April 2012 and June 2013 — each subsequent installment apparently was funded under a separate financing agreement, also signed by Hostilo (or someone at his firm) — and Cherokee Funding also assumed Ruth's obligations under a prior loan that he had secured for $2,500. Ruth settled his personal-injury lawsuit for an unspecified amount sometime in 2016, and Cherokee Funding then sought to recover more than $84,000 from Ruth pursuant to the terms of his financing agreement.[8]

---

[8] Ruth ended his relationship with Hostilo prior to the settlement of his lawsuit, but he does not allege that Cherokee Funding demanded payment from him under the "liquidated damages" provision of the financing agreement. See note 5 supra.

Hostilo (or someone at his firm) signed the financing agreement for Oglesby in or around 2013, after Hostilo advised her that she ought to seek medical treatment for the injuries that she sustained in the automobile accident,[9] and he told her that she could get a "cash advance" from Cherokee Funding to pay for the treatment. Cherokee Funding thereafter provided $400 to Oglesby. She settled her personal-injury lawsuit for an unspecified amount about a year later, and Hostilo deducted $1,000 from her settlement proceeds to repay Cherokee Funding.

2. In 2016, Ruth and Oglesby filed this lawsuit against Cherokee Funding, seeking relief for themselves and a putative class of similarly situated persons to whom Cherokee Funding provided funds under financing agreements facilitated by Hostilo.[10] Among other things, Ruth and Oglesby alleged that their financing agreements with Cherokee Funding violate the Industrial Loan Act and the Payday Lending Act,[11] and they sought relief against Cherokee Funding

---

[9] Hostilo explained to Oglesby that medical treatment would help to "substantiate her damage claim."

[10] Ruth and Oglesby also sued Hostilo's law firm, but this appeal does not concern the claims against the law firm.

[11] In particular, Ruth and Oglesby alleged that Cherokee Funding violated these statutes by engaging in the business of making small loans (less than $3,000) in Georgia

5

pursuant to the remedial provisions of those statutes.[12] Cherokee Funding filed a motion to dismiss those claims under OCGA § 9-11-12 (b) (6), contending that neither statute applies to its provision of funds under the financing agreements. The trial court granted the motion in part and denied it in part, concluding that the Payday Lending Act applies, but the Industrial Loan Act does not.[13] The trial court issued a certificate of immediate review, and Cherokee Funding sought leave to pursue an interlocutory appeal from the denial of its motion to dismiss the claim under the Payday Lending Act. The Court of Appeals granted the application for interlocutory appeal, and Ruth and Oglesby then cross-appealed the dismissal of their claim under the Industrial Loan Act.

without proper licensing and by charging an unlawful rate of interest. In addition to the claims alleging violations of the Industrial Loan Act and the Payday Lending Act, Ruth and Oglesby asserted claims in their initial complaint against Cherokee Funding for conspiracy and attorney fees, but those claims are not before us.

[12] Pursuant to OCGA § 7-3-29 (a), "[a]ny person who shall make loans under [the Industrial Loan Act] without first obtaining a license . . . shall be guilty of a misdemeanor; and any contract made under [the Industrial Loan Act] by such person shall be null and void." Similarly, OCGA § 16-17-3 provides that any person who violates relevant provisions of the Payday Lending Act is "barred from the collection of any indebtedness created by said loan transaction," and the "transaction shall be void ab initio." In addition, OCGA § 16-17-3 establishes that any offending lender shall "be liable to the borrower in each unlawful transaction for three times the amount of any interest or other charges to the borrower."

[13] After the trial court denied the motion to dismiss in part, Ruth and Oglesby amended their complaint to add claims for charging usurious interest under OCGA § 7-4-18 and conspiracy to charge usurious interest. Those claims are not at issue in this appeal.

6

The Court of Appeals concluded that neither statute applies, reasoning that the statutes apply only to "loans," that the provision of funds under an agreement that imposes only an uncertain and contingent repayment obligation is not a "loan," and that such a transaction is better characterized as an "investment contract." See Cherokee Funding, 342 Ga. App. at 408-410. Accordingly, the Court of Appeals affirmed the dismissal of the claim under the Industrial Loan Act, see id. at 411 (2), and it reversed the denial of the motion to dismiss the claim under the Payday Lending Act. See id. at 409 (1). We granted Ruth and Oglesby's petition for a writ of certiorari to consider whether the Court of Appeals correctly understood the scope of the Industrial Loan Act and the Payday Lending Act.

3. We turn first to the Industrial Loan Act, and we begin with the familiar and settled principles that inform our consideration of statutory meaning:

> A statute draws its meaning from its text. When we read the statutory text, we must presume that the General Assembly meant what it said and said what it meant, and so, we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. The common and customary usages of the words are important, but so is their context. For context, we may look to other provisions of the same statute,

7

the structure and history of the whole statute, and the other law —
constitutional, statutory, and common law alike — that forms the
legal background of the statutory provision in question.

City of Marietta v. Summerour, 302 Ga. 645, 649 (2) (807 SE2d 324) (2017)
(citations and punctuation omitted). By its terms, the Industrial Loan Act applies
"to all persons . . . engaged in the business of making loans in amounts of
$3,000.00 or less," OCGA § 7-3-4,[14] it requires such persons to obtain a license
from the state Industrial Loan Commissioner, see OCGA § 7-3-8, it limits the
interest that can be charged upon loans of $3,000 or less to "a rate not to exceed
10 percent per annum of the face amount of the contract," OCGA § 7-3-14 (1),
and it specifies the other fees that permissibly may be charged to a borrower in
connection with a loan of $3,000 or less. See OCGA § 7-3-14 (2)-(5). See also
OCGA § 7-3-15. The Industrial Loan Act provides that

> no person within the [scope of the Act] shall charge, contract for, or
> receive, directly or indirectly, on or in connection with any loan,
> any interest, charges, fees, compensation, or consideration which is
> greater than the rates for same provided in [the Act] or engage in the
> business of making such loans of $3,000.00 or less without a
> license from the Commissioner as provided in [the Act].

[14] The Industrial Loan Act exempts certain businesses, such as banks, from its provisions, see OCGA § 7-3-6, but no one contends that Cherokee Funding is exempted from the Industrial Loan Act.

8

OCGA § 7-3-4. Ruth and Oglesby allege that Cherokee Funding provided funds to them under their financing agreements in installments of less than $3,000, and they allege that Cherokee Funding has no license under the Industrial Loan Act. Whether they have stated a claim for a violation of the Industrial Loan Act, therefore, depends upon whether their transactions with Cherokee Funding amount to "loans."

The Industrial Loan Act expressly defines a "loan" as "any advance of money in an amount of $3,000.00 or less under a contract requiring repayment and any and all renewals or refinancing thereof or any part thereof." OCGA § 7-3-3 (4). The financing agreements at issue in this case impose an obligation upon Ruth and Oglesby to repay Cherokee Funding, but that obligation is a contingent and limited one. The obligation of repayment attached only upon the successful resolution of their personal-injury lawsuits, and even then, Ruth and Oglesby were obligated to repay no more than the amounts recovered in their lawsuits. In the event that they had been altogether unsuccessful in their lawsuits, the financing agreements are clear that Cherokee Funding would have "receive[d] nothing." An agreement that involves such a contingent and limited obligation of repayment is not a "contract requiring repayment," as those words

9

are commonly and ordinarily understood in the context of the law of usury.[15] See Anglo-Dutch Petroleum Intl., Inc. v. Haskell, 193 SW3d 87, 96-97 (Tex. App. 2006) (funding under contract providing that obligation to repay is contingent upon recovery in litigation was not a "loan" for the purposes of usury laws). "Where the payment of the principal sum depends upon the happening of any contingent event . . . the transaction is not amenable to the usury laws . . . ." Walton Guano Co. v. Copelan, 112 Ga. 319, 325 (2) (37 SE 411) (1900). We agree with our Court of Appeals that, when the obligation to repay is only contingent and limited, there generally is no "loan" for purposes of the Industrial Loan Act.

4. We reach the same conclusion with respect to the Payday Lending Act, which was enacted in 2004 to "strengthen the penalties for those engaging in

---

[15] The general law of usury forms a significant part of the legal background for both the Industrial Loan Act and the Payday Lending Act, and the general law of usury, therefore, is important context that informs our understanding of the meaning of those statutes. See Summerour, 302 Ga. at 649 (2). We note, however, that even beyond the context of usury law, when a statute speaks of a "requirement" without any words of limitation, it commonly is understood to refer to an unconditional obligation, not a contingent one. See United States v. Phipps, 81 F3d 1056, 1060 (II) (D) (11th Cir. 1996) ("[W]e should read 'a report required' in [the statute] to mean a report that the financial institution is obligated to file, which is what 'required' means, not a report that it *would have been* obligated to file had circumstances been different." (emphasis in original)).

[illegal] activities" "commonly referred to as payday lending, deferred presentment services, or advance cash services and other similar activities" and to "reiterate" that those activities were already unlawful in Georgia. OCGA § 16-17-1 (e). Like the Industrial Loan Act, the Payday Lending Act governs "the making of loans of $3,000.00 or less," OCGA § 16-17-2 (a), and it generally prohibits "any person to engage in any business, in whatever form transacted, . . . which consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less" subject to several enumerated exemptions. OCGA § 16-17-1 (a). Among the exemptions are loans authorized by the Industrial Loan Act or various other banking and financing statutes. See OCGA § 16-17-2 (a) (1), (2). Also exempted are loans made by certain banks, OCGA § 16-17-2 (a) (3), and tax refund anticipation loans. OCGA § 16-17-2 (a) (4).

While the Payday Lending Act governs "the making of loans of $3,000.00 or less," it does not expressly define the term "loan." But it implicitly gives meaning to that term by its provision that it "shall apply with respect to all transactions in which funds are advanced to be repaid at a later date," OCGA § 16-17-2 (b), a provision that is most reasonably understood to contemplate an

11

agreement that imposes an obligation to repay. We fail to see any meaningful distinction between a "contract requiring repayment" (as used in the Industrial Loan Act) and an agreement pursuant to which "funds are advanced to be repaid" (as used in the Payday Lending Act). When funds are advanced under an agreement that repayment is required only upon the occurrence of a contingency, and even then, perhaps only to a limited extent (depending upon the particulars of the contingency), the funds are not, we think, "advanced to be repaid" for purposes of the Payday Lending Act. See Walton Guano, 112 Ga. at 325 (2). See also Anglo-Dutch Petroleum, 193 SW3d at 96-97. We agree with the Court of Appeals that the Payday Lending Act does not extend to such transactions.

5. On appeal, Ruth and Oglesby argue that the contingent repayment obligation in their financing agreements is illusory because Cherokee Funding only makes loans, they say, when the risk that the contingency will fail to arise is close to null. It is easy to imagine an agreement with a sham contingent repayment provision that reflects an attempt to evade the usury laws. And a court properly presented with a claim that a contingent repayment provision is a sham should look beyond the text of the agreement to "penetrate to the

substance" and perhaps find an unlawful loan, notwithstanding the contingency. See Pope v. Marshall, 78 Ga. 635, 640 (2) (4 SE 116) (1887) ("No disguise of language can avail for covering up usury, or glossing over a[ ] usurious contract. The theory that a contract will be usurious or not according to the kind of paper-bag it is put up in, or according to the more or less ingenious phrases made use of in negotiating it, is altogether erroneous. The law intends that a search for usury shall penetrate to the substance.") See also OCGA § 16-17-1 (c) ("The General Assembly has determined that various payday lenders have created certain schemes and methods in order to attempt to disguise these transactions[.]"); OCGA § 16-17-2 (b) (3) (providing that the Payday Lending Act shall apply notwithstanding that the transaction includes "[a]ny other element introduced to disguise the true nature of the transaction as an extension of credit").

But this case — at least based on the pleadings to this point — presents no such claim. Ruth and Oglesby's complaint does not allege that the contingencies contained in the financing agreements were illusory, nor does it allege that there was no chance that they would be unsuccessful in their

13

underlying lawsuits.[16] And although a motion to dismiss for failure to state a claim should not be granted where "evidence may be introduced which will sustain a grant of the relief sought by the claimant," such evidence must be "within the framework of the complaint." RES-GA McDonough, LLC v. Taylor English Duma LLP, 302 Ga. 444, 445-446 (807 SE2d 381) (2017) (citation omitted). As a result, even if all of the factual allegations asserted in Ruth and Oglesby's complaint are accepted as true and construed in the light most favorable to them, they have failed to state a claim under either the Industrial Loan Act or the Payday Lending Act.

6. Based on the allegations contained in Ruth and Oglesby's complaint, the Industrial Loan Act and the Payday Lending Act do not apply to the

---

[16] It is unclear whether the outcome of yet-to-be resolved litigation ever can be certain enough to render a contingency based on the result of pending litigation illusory. See Anglo-Dutch Petroleum, 193 SW3d at 96-97.

financing agreements at issue. The judgment of the Court of Appeals is affirmed.[17, 18]

Judgment affirmed. Nahmias, P. J., Benham, Hunstein, Boggs, Warren, JJ., and Judge George F. Hutchinson concur. Melton, C. J., concurs fully in Divisions 1, 2, 3, 5, and 6 and in judgment only in Division 4. Peterson, J., not participating. Bethel, J., disqualified.

---

[17] In addition to the claims raised by Ruth and Oglesby that were not addressed in the trial court's order and are not at issue in this appeal (see footnotes 10, 11, and 13, supra), we do not address whether Cherokee Funding's actions violate OCGA § 44-12-24 (which prohibits the assignment of a right of action for personal torts) or OCGA § 13-8-2 (a) (5) (which prohibits contracts of maintenance and champerty).

[18] Generally speaking, usury laws are designed to protect the vulnerable from exploitation by the unscrupulous. See Franklin W. Ryan, Usury and Usury Laws 74 (1924) (usury is "the unconscionable exploitation of a borrower's necessitous condition"). And not infrequently, personal-injury plaintiffs find themselves in circumstances that leave them vulnerable to exploitation by unscrupulous lenders. See Douglas R. Richmond, Other People's Money: The Ethics of Litigation Funding, 56 Mercer L. Rev. 649, 649 (2005) ("[P]laintiffs who are disabled as a result of injuries they have sustained may need money to live on."). Personal-injury plaintiffs, therefore, fit neatly within the population that usury laws historically have been enacted to protect. But it is not the place of this Court to extend existing usury laws beyond their plain terms. See Deal v. Coleman, 294 Ga. 170, 174 (1) (a) n.11 (751 SE2d 337) (2013). The Industrial Loan Act and the Payday Lending Act do not apply to the transactions at issue in this case (as those transactions are framed by the pleadings). If the General Assembly wishes to revisit the scope of those laws and extend them to cover transactions of these sorts, it certainly may do so.

Decided October 22, 2018.

Certiorari to the Court of Appeals of Georgia — 342 Ga. App. 404.

The Summerville Firm, J. Darren Summerville, Angela R. Fox; Karsman, McKenzie & Hart, Jeremy S. McKenzie, C. Dorian Britt; Savage & Turner, R. Bartley Turner, Kathryn H. Pinckney, for appellants.

Holland & Knight, Laurie W. Daniel, Matthew D. Friedlander; Hunter, Maclean, Exley & Dunn, Bradley M. Harmon, Allan C. Galis; Gardere Wynne Sewell, Geoffrey H. Bracken, Scott D. Ellis, for appellees.

Kade Cullefer; Jeremy L. Kidd; Thomas D. Weldon, Jr., amici curiae.