**THIRD DIVISION**
**DOYLE, P. J.,**
**GOBEIL, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 25, 2023**

# In the Court of Appeals of Georgia

A23A0892. RESURGENS, LLC et al. v. ERVIN et al.

GOBEIL, Judge.

In large part, this appeal concerns the scope of health care provider legal immunity in a limited time period during the COVID-19 public health emergency: after the issuance of Governor Kemp's April 14, 2020 Executive Order ("Designation of Auxiliary Emergency Management Works and Emergency Management Activities") and before the passage of the Pandemic Business Safety Act months later. In the underlying case, Frances and Anthony Ervin filed a medical malpractice action against Dr. Jason Velez and his employer, Resurgens, LLC d/b/a Resurgens Orthopaedics (collectively, "the defendants"), for injuries that Frances sustained as a result of an elective back surgery performed in May 2020. The defendants sought to dismiss the action on the ground that they were immune from liability under

measures passed in response to the COVID-19 pandemic, or in the alternative, to compel arbitration. The trial court denied the defendants' motion, and, after receiving permission from this Court to file an interlocutory appeal, the instant appeal followed. On appeal, the defendants argue that the trial court erred in denying their motion to dismiss and alternatively erred in denying their request to compel arbitration. For the reasons set forth below, we affirm the trial court's order.

"On appeal, this Court reviews the denial of a motion to dismiss de novo." *Jensen v. Engler*, 317 Ga. App. 879, 879 (733 SE2d 52) (2012) (citation and punctuation omitted). However, we construe the pleadings in the light most favorable to the plaintiffs and resolve any doubts in their favor. See *Marshall v. McIntosh County*, 327 Ga. App. 416, 416 (759 SE2d 269) (2014). See also *Smith v. Adventure Air Sports Kennesaw, LLC*, 357 Ga. App. 1, 1 (849 SE2d 738) (2020) ( "This Court reviews the grant or denial of a motion to compel arbitration de novo to see if the trial court's decision is correct as a matter of law; but we defer to the trial court's factual findings unless they are clearly erroneous.") (citation, punctuation, and footnotes omitted).

So viewed, the record shows that Frances was admitted to Emory Johns Creek Hospital ("Emory") on May 14, 2020, to undergo a thoracic laminectomy with

2

implantation of a spinal cord stimulator to treat her chronic back pain and radiculopathy. Dr. Velez, a Doctor of Osteopathic Medicine and orthopedic surgeon, performed the procedure. Frances had been experiencing pain in her back for some time, and she agreed to undergo the surgery at an office visit with Dr. Velez on February 28, 2020. The escalation of the COVID-19 pandemic occurred in the following months, yet Dr. Velez and Frances determined that she would proceed with the surgery a few months later in May 2020. Upon her admission to the hospital, Frances signed paperwork consenting to treatment and various Emory policies, including a section titled: "Agreement to Alternative Dispute Resolution," which is discussed in greater detail below.

In the recovery room after surgery, Frances reported weakness and paralysis in her left leg. Later that day, Dr. Velez performed another procedure to remove the spinal cord implant. Frances was discharged several days later on May 22, 2020. Frances alleged that she suffers from "continuing lower extremity weakness and difficulty walking" to this day as a result of the procedures. She eventually suffered a catastrophic stroke and now requires round-the-clock care.

Frances and her husband Anthony filed the instant complaint in February 2022, alleging professional negligence by Dr. Velez and his employer, Resurgens. Notably,

3

the Ervins raised no allegations of willfulness, gross negligence, or bad faith in their original complaint. There also was no allegation that Dr. Velez's performance of the surgery was impacted by the COVID-19 pandemic. The defendants moved to dismiss the complaint. Relevant to the issues on appeal,[1] the defendants argued that they were entitled to immunity from suit based on OCGA § 38-3-35 (the statute covering "immunity from liability of agencies and emergency management workers"). They reasoned that Dr. Velez was an "auxiliary emergency management worker" and that the service and care provided to Frances constituted "emergency management activities" as defined by executive orders issued by Governor Brian Kemp (after declaring a public health state of emergency in response to the COVID-19 pandemic). The defendants argued that these orders and the state law shielded them from liability for any injuries other than those caused by willful misconduct, gross negligence, or bad faith, which the Ervins had not alleged or proven through the submission of an expert affidavit. Alternatively, the defendants sought to stay the proceedings and

---

[1] The defendants also argued in their motion to dismiss that they were immune from suit under the federal Public Readiness and Emergency Preparedness Act (the "PREP Act"), 42 USC §§ 247d-6d, 247d-6e, but they concede that this law is not at issue in the instant appeal.

4

compel arbitration based on the admission agreement signed by Frances upon her admission to Emory, which included an arbitration agreement.

The Ervins then amended their complaint to add a claim for willful misconduct, gross negligence, or bad faith on the part of the defendants, as well as a claim for attorney fees pursuant to OCGA § 9-15-14. After the parties commenced discovery and appeared at a hearing on the defendants' motion to dismiss, the trial court denied the motion. The trial court concluded that Senate Bill 359, titled "The Pandemic Business Safety Act" (later codified at OCGA § 51-16-1 et seq.), "restricted application" of Governor Kemp's executive orders issued in April and May 2020 to provide legal immunity to healthcare workers only in connection with COVID-19 liability claims, which did not apply to complications from Frances's elective spinal surgery. The court found that this conclusion comported with the intent of the executive orders, which was to "limit the liability of healthcare workers related to transmission, infection, exposure, or potential exposure of COVID-19." Thus, the defendants were not entitled to immunity under OCGA § 38-3-35. The court also concluded that the admissions agreement requiring arbitration applied only between Frances and Emory, and the defendants were therefore not entitled to enforce it

5

against Frances. The defendants filed an application for interlocutory appeal, Case No. A23I0095, which we granted, and the instant appeal followed.

1. The defendants first argue that the trial court erred in denying their motion to dismiss the complaint. Specifically, they assert that the Ervins failed to state a claim which overcame the defendants' immunity under OCGA § 38-3-35 and the executive orders issued by the Governor. We disagree.

On March 14, 2020, Governor Kemp entered Executive Order 3.14.20.01 declaring a public health state of emergency due to the COVID-19 pandemic.[2] On April 14, 2020, Governor Kemp entered Executive Order 04.14.20.01, titled "Designation of Auxiliary Emergency Management Workers and Emergency Management Activities" (the "Executive Order"). Citing OCGA § 38-3-51 (Emergency Powers of the Governor), and noting that "[h]ealthcare institutions and facilities require additional flexibility to provide the critical assistance and care needed by the state during this unprecedented emergency[,]" the Executive Order declares that "employees, staff, and contractors of healthcare institutions and medical facilities shall be considered auxiliary emergency management workers pursuant to

[2] All of the Executive Orders discussed in this opinion are contained in the record on appeal and available to be viewed online at https://gov.georgia.gov/executive-action/executive-orders/2020-executive-orders.

6

Code Section 38-3-35." It further declares that "services provided or performed by healthcare institutions and medical facilities . . . shall be considered emergency management activities pursuant to Code Section 38-3-35." Under OCGA § 38-3-35 (b),[3] certain specified persons or entities, including as relevant here, an "auxiliary emergency management worker," who is "engaged in any emergency management activity," and who is reasonably attempting to comply with emergency orders or regulations is immune from liability for death or personal injury "as a result of any such activity," except in cases of willful misconduct, gross negligence, or bad faith.[4]

---

[3] Both OCGA § 38-3-51 and OCGA § 38-3-35 (b) fall within the Georgia Emergency Management Act of 1981 (OCGA § 38-3-1 et seq.) ("GEMA"), which provides a framework for the State's response to emergencies or disasters and is discussed further below.

[4] There is no Georgia precedent interpreting GEMA and the Executive Order as they apply to the question of immunity in a case like we have here. In *Arbor Mgmt. Servs., LLC v. Hendrix*, 364 Ga. App. 758 (875 SE2d 392) (2022), we addressed the immunity granted by the PREP Act and GEMA in a wrongful death action arising out of care provided to a nursing home resident who contracted and died from COVID-19. In that case, we concluded that the trial court correctly ruled that the action fell outside the scope of the PREP Act, but we found that the action was barred by the Pandemic Business Safety Act and OCGA § 38-3-35 (b) because the complaint failed to allege gross negligence or willful misconduct. Id. at 764-768 (1), (2). *Hendrix* is the only Georgia case that addresses the Pandemic Business Safety Act and GEMA immunity, but it is not instructive here where the defendants have not shown that Frances's injuries were related to COVID-19 and where the alleged malpractice occurred prior to the enactment of the Pandemic Business Safety Act.

7

The defendants argue that, pursuant to the Executive Order, Frances's non-COVID related spinal surgery was considered an emergency management activity performed by an auxiliary emergency management worker — reasoning that Dr. Velez was a contractor who performed healthcare services at a healthcare institution after the Executive Order went into effect. In other words, the defendants broadly interpret the Executive Order to cover services regardless of their relatedness to the public health emergency. The defendants also contend that the Ervins raised only bare and conclusory allegations of willfulness, gross negligence, or bad faith in their amended complaint that were insufficient to bypass OCGA § 38-3-35 (b)'s general grant of immunity. Accordingly, the defendants maintain that Dr. Velez cannot be held liable for injuries caused at the time he was purportedly performing emergency management activities while designated as an auxiliary emergency management worker.

The Ervins counter with a "common sense interpretation" of the Executive Order: that it applies to protect frontline healthcare workers who were responding directly to the COVID-19 pandemic, not to orthopedic surgeons performing elective procedures unrelated to the ongoing public health emergency. For the reasons that

8

follow, we ultimately agree with the Ervins that Dr. Velez has not shown that he is immune from suit under the facts presented.

First, in interpreting the Executive Order, we must consider its text in the legal context in which it was issued and that existed at the time of the alleged malpractice. And in doing so, we look for the plain and ordinary meaning of the relevant text. *Baxter v. State*, 134 Ga. App. 286, 291 (2) (214 SE2d 578) (1975) (executive orders, until rescinded or superseded, have the force and effect of law); *Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013) (when considering the meaning of law, we "afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would") (citations and punctuation omitted). With these principles in mind, we begin with the text of the Executive Order and that of the statutes it references (and under whose authority it was issued).

The Executive Order states that "employees, staff, and contractors of healthcare institutions and medical facilities shall be considered auxiliary emergency management workers pursuant to Code Section 38-3-35 . . . and where services are provided or performed during the Public Health State of Emergency." And further,

9

it directs that "during the Public Health State of Emergency, services provided or performed by healthcare institutions and medical facilities . . . shall be considered emergency management activities pursuant to Code Section 38-3-35." Therefore, we first consider whether Dr. Velez was considered an "auxiliary emergency management worker." As a contractor of a healthcare institution, Dr. Velez indeed may have been designated an auxiliary emergency management worker under OCGA § 38-3-35. However, to receive immunity, he also must demonstrate that he was engaged in emergency management activities pursuant to the Executive Order and GEMA. We conclude he has not shown that he was.

Standing alone, the Executive Order's direction that "services provided or performed by healthcare institutions and medical facilities . . . shall be considered emergency management activities pursuant to Code Section 38-3-35" might suggest the broad interpretation advanced by the defendants: essentially that all services performed while the Executive Order was in effect, not just services related to the public health emergency, are covered for immunity purposes. But, we do not consider textual provisions in isolation, but rather in context. And here, we find that a plain reading of this context — both within the Executive Order and within GEMA —

clearly points to only covering "emergency management activities" – that is, services related in some manner to managing the emergency.

Significantly, the Executive Order states explicitly that it is issued under the authority of OCGA § 38-3-51 (GEMA), repeatedly cites that authority in connection with addressing the COVID-19 public health emergency, and ties the life of the Executive Order to that of the Public Health State of Emergency.[5] Already, this language correlates the protected activities with the emergency at hand. And the preamble to the Executive Order clearly underscores its nexus to the public health emergency, referring to the need to provide "additional flexibility" to healthcare institutions and facilities providing "*critical assistance and care* needed by this state

---

[5] For instance, see Executive Order preamble: "Whereas: . . . *due to the impact of COVID-19 . . .* I issued Executive Order No. 03.14.20.01, declaring a *Public Health State of Emergency . . .*"; "Whereas: *Code Section 38-3-51 (c) (4)* vests the Governor with the power to perform and exercise such other functions, powers, and duties as may be deemed necessary to promote and secure the safety and protection of the civilian population"; "Whereas: *Code Section 38-3-51 (d) (1)* vests the Governor with the power to suspend any regulatory statute prescribing the procedures for conduct of state business, or the orders, rules, or regulations of any state agency if strict compliance with any statute, order, rule, or regulation would in any way prevent, hinder, or delay necessary action *in coping with the emergency or disaster*"; "Whereas: Healthcare institutions and facilities require additional flexibility to provide the critical assistance and care needed by this state during this *unprecedented emergency*"; and "Now, therefore, *pursuant to Code Section 38-3-51*, and the authority vested in me as the Governor . . . ." (Emphasis supplied.)

11

*during this unprecedented emergency*." See *Harrell v. Mount*, 193 Ga. 818, 820 (1) (20 SE2d 69) (1942) ("the executive order here involved must be held to be what it declares itself to be . . . and that the words of the Governor . . . mean nothing more"); *City of Marietta v. Summerour*, 302 Ga. 645, 652 (2) n. 3 (807 SE2d 324) (2017) (codified preambles are part of act and are appropriate to read in pari materia).

As the Executive Order explicitly was authorized under GEMA, we must consider that statute in tandem with it. *See Scott v. State*, 299 Ga. 568, 571 (2) (788 SE2d 468) (2016) ("In our interpretation of statutes, we . . . look to the text of the provision in question, and its context within the larger legal framework, to discern the intent of the legislature in enacting it.") Turning to GEMA, its purpose explicitly appears in OCGA § 38-3-2 (a): to prepare and respond to "emergencies or disasters resulting from manmade or natural causes or enemy attack . . . ." And its provisions consistently refer to and underscore its emergency focus. For instance, OCGA § 38-3-3 (2) defines "emergency management" as "the preparation for the carrying out of all *emergency functions* other than functions for which military forces are primarily responsible to prevent, minimize, and repair injury and damage resulting *from emergencies* . . . ." (Emphasis supplied.) OCGA § 38-3-3 (2) then proceeds to declare that such functions include "*emergency* medical services." (Emphasis supplied.)

12

Essentially, the defendants are asking us to interpret the Executive Order as providing immunity to *all healthcare activities* performed by healthcare workers at healthcare institutions from April 14, 2020 until the implementation of the Pandemic Business Safety Act, regardless of whether the activities otherwise were related to the ongoing public health emergency.[6] Our plain reading of the Executive Order — including its declarations, purpose, and intent (as expressed in its text) and the statutes it explicitly references, leads us to reject the defendants' sweeping interpretation. Thus, although Dr. Velez may have been an "auxiliary emergency management worker" under the Executive Order and OCGA § 38-3-35, unless he can show that he was also "engaged in any emergency management activity" when performing the actions that allegedly led to Frances's injuries, he is not automatically entitled to the protections outlined in the statute. The defendants do not cite to a

---

[6] This interpretation also would be at tension with statutory interpretation principles by foreclosing the right to a trial by jury for their medical malpractice claims. See *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 286 Ga. 731, 735 (2) (a) (691 SE2d 218) (2010) (there exists a common law right to a jury trial for claims involving the negligence of a health care provider); *Nalley v. Baldwin*, 261 Ga. App. 713, 714 (583 SE2d 544) (2003) (stating the canon of statutory construction that "[s]tatutes are not understood to effect a change in the common law beyond that which is clearly indicated by express terms or by necessary implication") (citation and punctuation omitted).

compelling argument supported by the record — at least at this stage of the proceedings — that Dr. Velez's performance of a surgery which both was: 1) elective (that is, non-emergency), and 2) apparently unrelated in any way to the COVID-19 public health emergency (save for taking place during the public health emergency's existence) — constituted an "emergency management activity"[7] (defined in OCGA § 38-3-3 (2)). For those reasons, we affirm the trial court's denial of the defendants' motion to dismiss the Ervins' complaint based on immunity granted by the Executive Order.[8]

---

[7] To the extent the defendants argue that the injuries resulting from Frances's surgery could be construed as resulting from the COVID-19 emergency because "the response to COVID-19 reasonably interfered with the arranging for or the providing of healthcare services or medical care at issue[,]" that argument is inappropriate for us to consider at this stage of the proceeding. It was not raised or considered by the trial court, and (in part because this case is still at the motion-to-dismiss stage) the record is devoid of evidence of whether or how the COVID-19 pandemic might have interfered with Frances's medical care. *Stewart v. Johnson*, 358 Ga. App. 813, 814 (856 SE2d 401) (2021).

[8] Notably, and as the trial court found, the General Assembly's subsequent passage of the Pandemic Business Safety Act comports with this interpretation of the Executive Order. In Senate Bill No. 359 introducing this law, the General Assembly (very similarly to the Governor in the Executive Order) found that healthcare institutions, facilities, and workers "require additional flexibility to provide the critical assistance and care needed by this state during the unprecedented COVID-19 pandemic" and thus extended protections provided by the Governor's Executive Orders beyond the declaration of the public health emergency. Ga. L. 2020 p. 588 § 1 (S.B. 359). The Act then goes on to provide protections for healthcare providers for

14

2. Alternatively, the defendants argue that the trial court erred in declining to compel arbitration. They rely on the admission paperwork signed by Frances before her surgery, which stated that she agreed "that any claim or dispute arising out of or related to the provision of health care services to [her] by Emory, shall be resolved by final and binding arbitration" and that she "underst[ood] and agree[d] that this agreement includes and encompasses any claims arising out of or relating to health care services which shall be provided to [her] upon this admission[.]"

We affirm the trial court's order. "Arbitration in Georgia is a matter of contract. As such, the construction of an arbitration clause in a contract is subject to the ordinary rules of contract construction." *SCSJ Enterprises, Inc. v. Hansen & Hansen Enterprises, Inc.*, 319 Ga. App. 210, 212 (1) (734 SE2d 214) (2012) (citations and punctuation omitted). The agreement at issue here is expressly between Frances and Emory.[9] In order for a third party to have standing to enforce an agreement, it is not

---

"COVID-19 liability claims" as defined in OCGA § 51-16-1 (3). However, we cannot rely on this subsequently passed, non-retroactive act. See *Southern States Chem., Inc. v. Tampa Tank & Welding, Inc.*, 316 Ga. 701, 707 (1) (888 SE2d 553) (2023) (stating the presumption against the retroactivity of civil statutes). Instead, we are limited to a fair reading of the Executive Order in the legal context in which it existed.

[9] This admission form expressly defined "Emory" as "an Emory Hospital or any outpatient care at an Emory facility including but not limited to [Emory Healthcare,

15

necessary that the party be specifically named in the contract, but merely that facially the contract show the contracting parties' intent to benefit the third party, *Boller v. Robert W. Woodruff Arts Center*, 311 Ga. App. 693, 698 (3) (716 SE2d 713) (2011), as the cardinal rule of contract construction is to ascertain the intention of the parties. OCGA § 13-2-3. Here, the admission agreement did not show the intent to benefit the defendants. To the contrary, it expressly stated that some health care services would be provided by independent contractors and Emory was not liable for the conduct of independent contractors such as Dr. Velez, stating: "Independent contractors are responsible for their own actions. Emory shall not be responsible for the independent contractors' actions or failure to act." Accordingly, the trial court correctly denied the defendants' request to compel arbitration under the admissions paperwork.

For the reasons set forth above, we affirm the trial court's order denying the defendants' motion to dismiss the action.

---

Emory University Hospital, Emory University Hospital Midtown, Emory Saint Joseph's Hospital, Emory John's Creek Hospital, The Emory Clinic, Emory University Orthopaedics & Spinal Hospital, Emory University Hospital at Wesley Woods, Wesley Woods Center of Emory University, Inc. d/b/a Budd Terrace, Dialysis Access Center of Atlanta, Emory Specialty Associates, ES Rehabilitation, LLC, ESOP Rehabilitation, LLC, Emory Decatur Hospital, Emory Long Term Acute Care, and Emory Hillendale Hospital]."

16

*Judgment affirmed. Doyle, P. J., and Senior Judge C. Andrew Fuller concur.*